IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs March 3, 2020

## STATE OF TENNESSEE v. JOCQUEZ PARHAM

**Appeal from the Criminal Court for Shelby County**
No. 17-01986          James M. Lammey, Judge

_____

### No. W2019-00868-CCA-R3-CD

_____

A Shelby County jury convicted the defendant, Jocquez Parham, of second-degree murder (Count 1), seven counts of attempted second-degree murder (Counts 2-8), and possession of a firearm during the commission of attempted second-degree murder (Count 9), for which the trial court imposed an effective sentence of eighty-eight years. On appeal, the defendant challenges the sufficiency of the evidence supporting his convictions and argues the trial court erred in failing to designate Antonio Tibbs as an accomplice and in failing to charge the jury accordingly. After our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and TIMOTHY L. EASTER, JJ., joined.

Shae Atkinson, Memphis, Tennessee (on appeal) and Juni Ganguli, Memphis, Tennessee (at trial), for the appellant, Jocquez Parham.

Herbert H. Slatery III, Attorney General and Reporter; Cody N. Brandon, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Stephanie Johnson and Ryan Thompson, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### Facts and Procedural History

This case arises after the defendant, Jocquez Parham, fired multiple shots into the home of Sandra Rudd as she and her family gathered on the front porch and in the living room. For his actions, the defendant was charged with the first-degree murder of Ronevia Williams (Count 1); seven counts of attempted first-degree murder against victims, O.W. Williams, Marquisha Williams, Kenkeunia Williams, Melissa Williams, O'Mir Williams,[1] Sandra Rudd, and Antonio Tibbs (Counts 2-8, respectively); and employing a firearm during the commission of a dangerous felony (Count 9). Tenn. Code Ann. §§ 39-12-101; -13-202; -210; -17-1324(b); -1324(i)(1)(A). The following evidence was presented at trial.

On December 7, 2016, Sandra Rudd hosted several members of her family at her home located at 1911 The Oaks Avenue ("the Oaks") in Shelby County, Tennessee. Ms. Rudd's children, Marquisha, Melissa, and O.W., gathered at her home along with Marquisha's daughters, Ronevia and Kenkeunia, and O.W.'s seven-day-old son, O'Mir. The events that led to the shooting stemmed from a series of telephone calls exchanged among the defendant, Mr. Tibbs, and O.W. which resulted in the three men gathering on the porch of Ms. Rudd's home. Around 12:00 p.m., Mr. Tibbs received a phone call from his friend, Deshun Williams, followed shortly thereafter by a phone call from the defendant. The defendant stated "he wanted a weapon," but Mr. Tibbs told the defendant he could not help him obtain one. Around the same time, Mr. Tibbs called O.W. and asked to meet him at the Oaks. O.W. arranged to meet Mr. Tibbs in his old neighborhood instead. Despite these plans, Mr. Tibbs and the defendant arrived at the Oaks and approached the porch of the home. Several of the defendant's victims testified about the shooting as seen from their own perspectives.

O.W. testified he had known Mr. Tibbs for approximately two years, he spoke to him on a daily basis, and Mr. Tibbs often met O.W. at the Oaks. On December 7, 2016, Mr. Tibbs arrived at the Oaks in a burgundy "SUV type truck with a couple of guys." After the vehicle parked in a neighboring driveway, Mr. Tibbs got out of the back-passenger side and joined O.W. and Melissa on the front porch. Even though they had planned to meet elsewhere, O.W. stated he was not upset with Mr. Tibbs when he arrived. O.W. next saw the defendant get out of driver's seat of the vehicle as another person remained in the front passenger seat. O.W. did not know the defendant, but Mr. Tibbs stated the defendant was his cousin. The defendant walked up to the porch, tried to sell marijuana to the group, and asked, "Where the dude at with the gun." O.W. responded, "It ain't no gun for sale." The defendant then rubbed his head, got back in the vehicle, and drove away. O.W. stated the entire interaction lasted about five minutes, and no one was angry. When O.W. told Mr. Tibbs the defendant was leaving, Mr. Tibbs stated,

---

[1] Because several of the victims have the same surname, we will refer to them by their first names for clarity. No disrespect is intended.

"Aw, naw, I'm fixing to stay here." As such, O.W. and Mr. Tibbs remained on the porch, and Melissa went back inside.

Approximately five minutes later, O.W. saw the vehicle again and said to Mr. Tibbs, "There go your cousin and them going back to pick you up." In response, Mr. Tibbs stated, "Naw, they ain't fixing to pick me up." When the vehicle stopped in front of the Oaks, O.W. saw the defendant and then saw guns emerge from the front and back driver's side windows. O.W. initially froze as he looked at the defendant's face, explaining he could not believe what was happening. O.W. saw "fire coming out the gun barrels" and heard "quite a few" gunshots as the defendant fired his gun for about two or three seconds. As he tried to run, O.W. was hit by a bullet. Melissa pulled O.W. inside the home where he was hit by another bullet. After the shooting ended, Mr. Tibbs came inside the house and then left.

The police arrived, and O.W. was transported to the hospital where he remained for twelve days while being treated for a broken left femur and a gunshot wound to the right Achilles tendon. While in the hospital, O.W. provided a statement to law enforcement and learned Ronevia had died. O.W. also reviewed a photographic lineup from which he identified the defendant as the shooter and identified the maroon/burgundy SUV as the vehicle involved. O.W. stated he was positive the defendant was driving the vehicle during the shooting because of a "dark spot" on the defendant's face and noted he described the defendant as having a "dark mark" on his face in his statement. O.W. also made an in-court identification of the defendant during trial.

Antonio Tibbs provided similar testimony. After speaking to Deshun and the defendant on the telephone, Mr. Tibbs began walking towards the Oaks. At approximately 1:00 p.m., the defendant drove by in a maroon SUV and picked Mr. Tibbs up. Mr. Tibbs testified he did not see any weapons in the vehicle but stated there was another passenger inside whom Mr. Tibbs recognized but did not know. Mr. Tibbs stated the defendant did not ask about a gun as they drove nor did he seem angry or upset.

Upon arriving at the Oaks, the defendant backed into the driveway. Mr. Tibbs exited the vehicle and approached the porch where he talked to O.W. and Melissa. The defendant then exited the vehicle from the driver's seat, approached the porch, and started "talking about a weapon" and marijuana. Specifically, the defendant offered to sell marijuana to the group but everyone declined. Then, the defendant asked to buy a gun. The defendant was rejected, and "everything changed." Mr. Tibbs stated the entire conversation lasted approximately thirty seconds during which the defendant's facial expressions indicated "something was wrong, like something was going on, like something wasn't right." The defendant became angry, walked away, got into the maroon vehicle, and drove away from the Oaks. Mr. Tibbs remained on the porch.

- 3 -

Approximately two minutes later, the defendant drove back by the Oaks with the passenger side of the vehicle facing the porch. As the shooting began, Mr. Tibbs saw the defendant in the driver's seat with his passenger on the other side. During the shooting, Mr. Tibbs saw an "AK" "coming out the window on the passenger side" but also assumed the defendant was shooting from the driver's side. Mr. Tibbs heard 14 gunshots, and a bullet grazed his right knee. Mr. Tibbs's testimony began to waver as he continued, stating that he was unsure who was driving the vehicle during the shooting but that he saw the defendant's face and then saw bullets. Mr. Tibbs stated that the vehicle stopped during the shooting but no one exited and that he did "not really" see the shooter. Mr. Tibbs again stated he thought the gunshots came from the passenger side of the vehicle but admitted the shooting happened "so fast." Ultimately, Mr. Tibbs clarified that there was one person shooting from the front passenger side of the vehicle and that he saw the defendant in the vehicle during the shooting.

When the shooting ended, Mr. Tibbs went inside the home and saw O.W. on the floor. He called 9-1-1 and then went to a neighbor's house for help. Mr. Tibbs then "went to the woods" to call his uncle, Christopher Tibbs. He told his uncle "an accident had just happened" and asked his uncle to pick him up. When his uncle did so, Mr. Tibbs told him that he and O.W. had been shot and that he needed to go back to the scene. Mr. Tibbs's uncle drove him back to the scene, and Mr. Tibbs provided a statement to law enforcement.

Mr. Tibbs reviewed his statement during his testimony. In the statement, he told police that the defendant picked him up in a maroon, four-door Honda SUV, and he asked the defendant to drive him to the Oaks. Upon entering the vehicle, Mr. Tibbs did not look in the back compartment of the vehicle and noted he had never seen the defendant's passenger. While inside the vehicle, the defendant again asked Mr. Tibbs about purchasing a gun. When Mr. Tibbs told the defendant that he could not help him obtain a gun, the defendant gave Mr. Tibbs "a dirty look." As noted in the statement, while on the porch, Mr. Tibbs asked O.W. if O.W. had "anything," meaning a weapon, but O.W. stated he did not. The defendant then approached the porch and gave Mr. Tibbs and O.W. a dirty look. The defendant asked if either Mr. Tibbs or O.W. wanted "2 for $25," referring to two grams of marijuana, but both men declined. The defendant again gave them a dirty look. In contrast to his in-court testimony, in his statement, Mr. Tibbs described the shooting, as follows: "The driver's side was closest and they was going on and shooting out the driver's side, 13, 14 shots." Mr. Tibbs identified the defendant, also known as "Two Face," as the shooter.

When asked to identify the defendant during trial, Mr. Tibbs initially stated he did not see the defendant in the courtroom but ultimately identified the defendant. Mr. Tibbs

stated he was unable to identify the other person in the vehicle at the time of the shooting and stated he does not know Martavious Barnes, Camerio Whitley, or Cordell Anderson. Finally, Mr. Tibbs testified he was not threatened prior to testifying against the defendant.

Melissa Williams also provided her recollection of the events leading up to the shooting. She recalled the phone call between Mr. Tibbs and O.W. on December 7, 2016. Mr. Tibbs stated he was coming over but O.W. told him that he would meet Mr. Tibbs "on the block" instead. Approximately five minutes later, around 8:30 or 9:00 a.m., Mr. Tibbs and the defendant arrived at the Oaks in a maroon SUV. The vehicle pulled in front of the mailbox before backing into the neighbor's driveway. Mr. Tibbs got out of the backseat of the vehicle, and the defendant exited the driver's seat. The two men approached the porch where Melissa and O.W. stood. The defendant offered to sell Melissa two grams of marijuana for $25, but she declined. The defendant then turned around to talk to O.W. Melissa did not hear what the defendant asked O.W. but stated O.W.'s response must not have been "very satisfying" because the defendant seemed angry as he left the porch and returned to his vehicle. When Melissa told Mr. Tibbs that he was being left behind, Mr. Tibbs stated the defendant was his cousin and always acted that way. The defendant then drove away, Melissa went back inside, and O.W. and Mr. Tibbs remained on the porch. Approximately three to five minutes passed before Melissa heard gunshots. Once the shooting began, Melissa ran to the door and saw the defendant driving the maroon vehicle. She testified that the passenger window was rolled down and the defendant "had a smirk on his face that will haunt you."

After the shooting, Melissa pulled O.W. inside the home because he had been shot "pretty bad." Melissa stated that there were too many gunshots to count and that it was "chaotic inside" the house. She saw Mr. Tibbs on the phone and then saw him walk away. The police arrived, and Melissa provided a statement. She identified the defendant as the shooter in a photographic lineup on December 12, 2016. In several photographic exhibits entered into evidence, Melissa identified her home at the Oaks and the maroon vehicle the defendant drove on the day of the shooting.

During cross-examination, Melissa stated she was not expecting Mr. Tibbs to come over on December 7 and recalled that O.W. told him not to come during their phone call. She stated no one argued while on the porch; however, after she declined the defendant's marijuana sale, the defendant "said something" to O.W. and became angry. Melissa reviewed the statement she gave to law enforcement and acknowledged she did not tell police that the defendant seemed angry or that she saw him smirk during the shooting. When the defendant drove away, Melissa was not expecting him to return. However, when the vehicle returned, Melissa stated that the driver's side was closest to the house and that the gunshots were coming from the back-driver's side. Melissa stated she did not see the defendant fire a weapon but again noted the defendant had a smirk on

his face. In reviewing the photographic lineup wherein she identified the defendant as the shooter, Melissa admitted it was a mistake to tell police the defendant was the shooter because she did not actually see him shoot as he was driving. During redirect examination, Melissa explained she could not tell for sure that the defendant was not shooting because everything happened so fast. Finally, Melissa reviewed her statement again and noted, "It just didn't seem right. It felt like [Mr. Tibbs] was setting [O.W.] up."

Marquisha, Kenkeunia, and Ms. Rudd also testified regarding what they observed from inside the home. Prior to the shooting, Marquisha was sitting in the living room when a burgundy SUV pulled up to the mailbox and stopped. Marquisha thought this was unusual and noted the vehicle remained by the mailbox for approximately three minutes before pulling into the neighbor's driveway. She saw Mr. Tibbs exit the front passenger side of the vehicle and "saw a few more heads" inside. Mr. Tibbs knocked on the door looking for O.W. Marquisha answered the door, called for O.W., and O.W. and Melissa joined Mr. Tibbs on the porch. Marquisha stated the three were "just talking and laughing" before Melissa came back inside the house. The defendant then exited the vehicle and approached the porch. After having a conversation, the defendant left the porch, returned to his vehicle, and drove away.

Shortly thereafter, Marquisha heard a "thump" followed by gunshots. She stated O.W. and Mr. Tibbs were on the porch and Melissa was standing near the door. Inside the home, there were "bullets flying" and "everything was being hit." When the shooting began, Ronevia was standing beside Marquisha as Marquisha held O'Mir on the couch with Kenkeunia. She stated the shooting was "quick," and after it ended, she saw Melissa "tending to O.W." who "was bleeding everywhere." Marquisha heard Ronevia yell "that she had been shot" and saw Ronevia walk into the hallway and fall. When the shooting ended, Marquisha found Ronevia "laying face down" and attempted to locate her wound. Two photographs of Ronevia were entered into evidence. According to Marquisha, Mr. Tibbs was on the porch during the shooting, but she did not recall if he returned to the scene.

Marquisha reviewed the statement she provided to law enforcement on December 7, 2016, which mirrored her trial testimony. In the statement, Marquisha told police that after the vehicle parked, "It was [Mr. Tibbs] who got out of the front passenger seat. I saw someone driving and someone in the rear seat. The driver's seat was leaning all the way back so you couldn't see his face."

Sandra Rudd also testified, stating she found it odd when Mr. Tibbs came to her house as she had not seen him in years and was not expecting him. Ms. Rudd went to the back of the house to change O'Mir's diaper while O.W. and Mr. Tibbs talked on the

porch. Before doing so, she saw Melissa join them outside. Not long afterwards, Ms. Rudd heard numerous gunshots and saw the glass door shatter. Marquisha told Ms. Rudd to get down and told the children to go to the back of the house. During the shooting, O.W. fell, and Melissa pulled him inside. O.W. indicated he had been shot, but Ms. Rudd could not find his wound. Ms. Rudd then heard Ronevia scream and fall to the floor. Ms. Rudd and Marquisha tried to find Ronevia's wound, believing she was bleeding internally. Once the shooting stopped, Ms. Rudd called 9-1-1 and provided a statement to law enforcement. Ms. Rudd testified she did not overhear any conversations between those on the porch, she did not see the shooter, and she did not know where Mr. Tibbs was during the shooting.

Prior to the shooting, Kenkeunia was sitting on the couch when a man came to the front porch and O.W. went outside to talk to him. She did not know if the man who knocked on the door was Mr. Tibbs but stated she did not see anyone else on the porch at the time. When she heard gunshots, Kenkeunia was frightened and "tucked [her] head into the couch" with Marquisha. She did not know who fired the shots and could not remember how long the shooting lasted but thought approximately five shots were fired. Kenkeunia saw "a bullet in the TV, a bullet in the couch," and "the front door glass was gone." When the shooting stopped, Kenkeunia went to the back of the house with O'Mir and saw that both O.W. and Ronevia had been shot. She provided a statement to law enforcement after the shooting.

Officer Jeremy Montgomery of the Memphis Police Department (MPD) responded to the scene sometime after 12:00 or 1:00 p.m. where his duties included rendering aid, making arrests, and preparing a report. He identified a map of the general area and Ms. Rudd's home in photographs presented during trial. Officer Montgomery explained he was equipped with a body camera as he entered the "chaotic" scene. As the State played the body camera footage for the jury, Officer Montgomery described the same. Near the shattered glass door, he found O.W. bleeding and suffering from a gunshot wound to the leg. Officer Montgomery advised Ms. Rudd as to how to apply a tourniquet and then checked on Ronevia who had also been shot. Officer Montgomery testified that Ms. Rudd indicated who the shooter was while he was on the scene, noting the potential shooter's name was Antonio according to the name heard on the body camera footage. Officer Montgomery did not hear anyone state that "Two-Face" was the shooter.

Numerous diagrams and photographs of the scene were entered into evidence and described for the jury by responding MPD Officer David Smith. Officer Smith also tagged evidence at the scene which included nine 7.62 cartridge casings and one projectile. Due to the number of vehicles on the scene, Officer Smith explained he was

not confident that he collected all of the spent cartridge casings, bullet fragments, or bullet projectiles and noted it was possible some bullets struck the hill by the house.

MPD Officer Jennifer Burton also responded to the scene where she created the crime scene log and maintained the perimeter. Before securing the scene, Officer Burton spoke with Mr. Tibbs who arrived in his uncle's vehicle and stated he was a victim of the shooting. Mr. Tibbs stated that he had been shot on his hand and that he had a hole in his pants. Officer Burton and Mr. Tibbs's interactions were captured on her body camera, and the footage was played for the jury.

MPD Homicide Investigator Clifton Dupree took the lead role in investigating Ronevia's death. He responded to the scene, conducted initial interviews, and canvassed the neighborhood. Investigator Dupree also took the evidence collected from the scene to the Tennessee Bureau of Investigation (TBI). The evidence included nine 7.62 cartridge casings, a projectile, and a bullet fragment obtained from Ronevia's autopsy.

Dr. Marco Ross, an expert in forensic pathology, completed the autopsy of Ronevia on December 8, 2016, noting she died of a gunshot wound to the pelvis. Photographs taken during the autopsy and x-rays of Ronevia's injuries were entered into evidence, including one photograph showing bullet fragments found within the pelvic wound track.

As the investigation progressed, Investigator Dupree interviewed and presented photographic lineups to O.W., Melissa, and Mr. Tibbs. Investigator Dupree also learned the suspect was nick-named "Two Face." However, it took approximately one week to identify the defendant as the suspect. In an effort to locate the defendant, Investigator Dupree contacted MPD Officer Walter Doty who participated in locating the defendant as part of the Multi-Agency Gang Unit. After a confidential informant provided a tip on the defendant's location, Officer Doty and approximately ten other officers located the defendant at a hotel where he was arrested on January 10, 2017.

Investigator Dupree also searched for the vehicle involved in the shooting after several witnesses described the vehicle as a maroon SUV. Investigator Dupree acknowledged that Mr. Tibbs described the vehicle as a maroon Honda Pilot though the investigation ultimately led to a maroon Mazda SUV. The vehicle was located on January 17, 2017, at the home of the defendant's brother, Martaveous Barnes. Mr. Barnes, Kamerio Whitley, and Cordell Anderson were standing near the vehicle when law enforcement arrived, and a 9-millimeter handgun along with two 7.62 by 39-millimeter cartridge casings were found in the vehicle. Investigator Dupree stated the casings came from an assault rifle and were turned over to the TBI. Investigator Dupree

identified the vehicle used in the shooting in photographs presented at trial and noted the owner of the vehicle filed an automobile theft report in November 2016.

Investigator Dupree testified that Mr. Tibbs was unable to identify Mr. Barnes, Mr. Whitley, or Mr. Anderson in photographic lineups but could not remember if he presented the same lineups to Melissa, O.W., Sandra, Marquisha, or Kenkeunia. Lyndie Sugg, a victim witness coordinator for the district attorney's office, testified she was unable to obtain personal service or contact with Mr. Whitley or Mr. Anderson prior to trial. She obtained personal service on Mr. Barnes who confirmed he would be in court for the defendant's trial. However, when Mr. Barnes failed to appear in court, Ms. Sugg had no explanation for his absence.

Kasia Lynch, an expert in firearms identification and a forensic scientist for the TBI Memphis Crime Lab, analyzed four separate exhibits containing the evidence provided by Investigator Dupree. At the time of her analysis, no firearms were provided with which to compare the evidence. In her first exhibit, Ms. Lynch stated the evidence was obtained from the Oaks and included nine 7.62 by 39-millimeter cartridge casings, a separate bullet, and bullet fragments. She determined the nine cartridge casings all had the same individual characteristics and concluded they were all fired from the same weapon. Based upon the individual characteristics found on the separate bullet of exhibit 1, Ms. Lynch determined it was consistent with a .30 caliber bullet. The bullet fragments of exhibit 1, however, did not retain individual characteristics, and Ms. Lynch was unable to compare the fragments to the other evidence.

Ms. Lynch's second exhibit included two 7.62 by 39-millimeter cartridge casings which came from the MPD crime processing division. She determined the casings in exhibit 2 were fired from the same weapon, but they were not fired from the same weapon as the casings in exhibit 1. Ms. Lynch's third exhibit included bullet fragments from the Medical Examiner's Office that were obtained from Ronevia's wound tract. Ms. Lynch determined these bullet fragments were .30 caliber bullets. She compared the .30 caliber bullet fragments taken from the wound track to the .30 caliber bullet of exhibit 1 and determined that the bullets were fired from the same weapon. The fourth exhibit examined by Ms. Lynch included a bullet found at the Oaks. Ms. Lynch determined it was "most consistent with having been fired in a 9-millimeter Ruger firearm, and I had nothing to compare it to microscopically, because it was a different caliber." Photographs of the evidence were into evidence.

Additionally, during the course of the investigation, Investigator Dupree requested recordings of the telephone calls the defendant made while in jail. Ruben Ramirez of the Criminal Intel Unit of the Shelby County Sheriff's Office completed the request and pulled eighteen of the defendant's jail telephone calls on January 27, 2017. Portions of

the telephone calls were played for the jury during trial. During one telephone call in particular, the defendant indicated to his listener that she not put her life on hold because of his actions.

As the State presented its case, the trial court twice discussed the accomplice status of Mr. Tibbs. First, the trial court asked the parties to consider whether the accomplice jury instruction should be given. The record indicates the defendant did not request the instruction at that time. In a later discussion, the trial court determined it would allow the jury to decide whether Mr. Tibbs was an accomplice and would charge the jury accordingly. The State asked the trial court to provide its reasoning for including the accomplice instruction, and the trial court stated:

> Well, from the facts of the case it -- it could be argued that [O.W.] was lured outside and caused to stay outside by this Antonio Tibbs fellow. The family seemed to think it was a setup. They even testified to that. I think that more than makes it a question for the jury. I'd hate to not to -- I mean, even though there is other proof that shows he wasn't an accomplice, because he was actually shot himself, it wasn't serious bodily injury. I don't know. It just appears from the proof that something was mighty strange. He showed up when he was told not to show up. He was told to meet him somewhere else when he didn't meet him somewhere else.
>
> …
>
> So all of that just seems kind of peculiar to me. I'm kind of like the family, I'm – I'm like -- and plus, he -- he came off on the witness stand pretty shady too, I think. So --

The record indicates the defendant did not engage in the discussion. However, the trial court ultimately decided the accomplice instruction was not warranted and did not include it in the final jury instructions. The defendant failed to object to the trial court's ruling.

The jury convicted the defendant of second-degree murder for the death of Ronevia Williams (Count 1), seven counts of attempted second-degree murder against O.W. Williams, Marquisha Williams, Kenkeunia Williams, Melissa Williams, O'Mir Williams, Sandra Rudd, and Antonio Tibbs (Counts 2-8), and possession of a firearm during the commission of attempted second-degree murder (Count 9). The trial court conducted a sentencing hearing after which it imposed an effective eighty-eight-year sentence. The defendant filed a motion for a new trial which was denied, and this timely appeal followed.

*Analysis*

I.      *Sufficiency of the Evidence*

The defendant argues the evidence is insufficient to support his convictions because the State failed to provide reliable witness testimony identifying him as either the driver or the shooter. The State asserts sufficient evidence exists to support the defendant's convictions as "questions of credibility are left to the jury" and are not to be reexamined on appeal, and we agree.

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977); *Farmer v. State*, 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. *Dorantes*, 331 S.W.3d at 379 (citing *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006)). This Court, when considering the sufficiency of the evidence, shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. *Id.*

The defendant's convictions include second-degree murder, attempted second-degree murder, and possession of a firearm during the attempt to commit second-degree murder. Second-degree murder is the "knowing killing of another" and is a result-of-conduct offense. Tenn. Code Ann. § 39-13-210(a)(1); *State v. Page*, 81 S.W.3d 781, 787 (Tenn. Crim. App. 2002). "In order to convict a defendant of attempted second-degree murder, the state is required to prove that the defendant acted with the intent to cause the knowing killing of another, believing his conduct would cause the result without further conduct on his part." *State v. Inlow*, 52 S.W.3d 101, 104 (Tenn. Crim. App. 2000); Tenn. Code Ann. §§ 39-12-101(a)(2) and 39-13-210(a). A person acts knowingly "when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b). "[T]he 'nature of the conduct' that causes death is inconsequential." *Page*, 81 S.W.3d at 787 (quoting *State v. Ducker*, 27 S.W.3d 889, 896 (Tenn. 2000)). Thus, a knowing intent is shown if the defendant acts with an awareness that his conduct is reasonably certain to cause the victim's death. *See id.* at 790-93. Whether a defendant acted "knowingly" is a question of fact for the jury. *Inlow*, 52 S.W.3d at 104-105. In assessing the defendant's intent, the jury may rely on "the character of the assault, the nature of the act and [on] all the circumstances of the case in evidence." *Id.* at 105 (citing *State v. Holland*, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993)). "It is an offense to possess a firearm . . . with the intent to go armed during the commission of or attempt to commit a dangerous felony." Tenn. Code Ann. § 39-17-1324(a). One such "dangerous felony" is attempted second degree murder. Tenn. Code Ann. § 39-17-1324(a), (i)(1)(B).

Here, the record indicates that on December 7, 2016, the defendant wanted to purchase a gun. In an effort to do so, the defendant contacted Mr. Tibbs and picked him up in a stolen, maroon vehicle. The defendant, along with an unidentified passenger, drove Mr. Tibbs to the Oaks in order to talk to O.W. When the defendant and Mr. Tibbs arrived at the Oaks, Melissa, Marquisha, Kenkeunia, Ronevia, O'Mir, and Ms. Rudd were also at the home. The defendant parked the stolen vehicle in a neighboring driveway and approached the porch where O.W., Melissa, and Mr. Tibbs stood. While on the porch, the defendant attempted to sell marijuana and to purchase a gun. When both proposals were denied, the defendant became angry and drove away. The defendant soon returned in the stolen vehicle with guns emerging from the rolled-down windows. Numerous shots were fired as the vehicle stopped in front of the Oaks. O.W. testified the defendant was driving the vehicle during the shooting and stated he saw the defendant shooting for a few seconds. Melissa testified she saw the defendant driving the vehicle during the shooting and noted the defendant "had a smirk on his face that will haunt you." Mr. Tibbs also testified the defendant was in the vehicle during the shooting. The defendant fled the scene and successfully hid from law enforcement until his arrest on January 10, 2017. In a recorded jail telephone call made after his arrest, the defendant encouraged his listener not to put her life on hold because of his actions.

During the investigation, O.W., Melissa, and Mr. Tibbs identified the defendant in photographic lineups and O.W. made an in-court identification of the defendant. O.W. and Melissa also identified the maroon SUV as the vehicle involved. Law enforcement later located the vehicle at the home of the defendant's brother, Martaveous Barnes. Inside the vehicle, law enforcement found a 9-millimeter handgun and two 7.62 by 39-millimeter cartridge casings. Ms. Lynch analyzed the evidence obtained during the investigation and determined the nine 7.62 cartridge casings found at the scene were all fired from the same weapon and the individual .30 caliber bullet found at the scene was fired from the same weapon as the .30 caliber bullet fragments obtained during Ronevia's autopsy. Ms. Lynch also examined an additional bullet found at the scene which she stated was "most consistent with having been fired in a 9-millimeter Ruger firearm."

Viewing the evidence in the light most favorable to the State, the record reflects numerous witnesses testified the defendant drove the vehicle from which two weapons fired multiple gunshots at the home where O.W., Melissa, Marquisha, Ronevia, Kenkeunia, O'Mir, Ms. Rudd, and Mr. Tibbs gathered. As a result of the shooting, O.W., Ronevia, and Mr. Tibbs were shot, and Ronevia ultimately died from her wounds. Based upon this evidence, the jury was at liberty to infer the defendant knew that firing a gun in the direction of the home which he knew to be filled with people could have resulted in any of their deaths. *Inlow*, 52 S.W.3d at 105. Accordingly, sufficient evidence exists to show the defendant "knowingly" shot and killed Ronevia and attempted to shoot O.W.,

Melissa, Marquisha, Kenkeunia, O'Mir, Ms. Rudd, and Mr. Tibbs while possessing a firearm.

The defendant argues the State failed to prove he was the driver or the shooter because several of the witnesses provided contradictory details of the shooting and/or testified they did not actually see the defendant fire a gun. The evidence produced at trial, however, demonstrates simply that each of the defendant's victims described the shooting from their own perspective. While slight discrepancies are apparent in the testimonies of the defendant's victims, this Court presumes that any conflicts between their testimonies were resolved by the jury in reaching their verdict. *See Campbell*, 245 S.W.3d at 335; *State v. Adams*, 45 S.W.3d 46, 55 (Tenn. Crim. App. 2000). Furthermore, as charged by the trial court, one is "criminally responsible for an offense committed by the conduct of another, if: [a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." Tenn. Code Ann. § 39-11-402(2). If convicted under the criminal responsibility theory, defendants are "considered to be principal offenders, just as if they had committed the crime themselves." *State v. Little*, 402 S.W.3d 202, 217 (Tenn. 2013) (citing *State v. Carson*, 950 S.W.2d 951, 954 (Tenn. 1997)). As noted above, the record shows the defendant was in the vehicle as multiple gunshots were fired at the Oaks from the same, and the jury attributed the shooting to the defendant as a result. Accordingly, the defendant's arguments alleging conflicting testimony exists identifying him as either the driver or the shooter are without merit and the defendant is not entitled to relief.

## I.    *Jury Instructions*

The defendant argues the trial court erred by failing to designate Antonio Tibbs as an accomplice and by failing to charge the jury accordingly. The defendant asserts Mr. Tibbs is "criminally responsible as an accomplice" because "[h]is actions of riding over to the house he was instructed not to be at, getting out of the same vehicle from which the shots were fired, and luring people from inside the house to be outside on the porch just prior to the shooting occurring makes Mr. Tibbs an accomplice." The defendant suggests the trial court's omission of the accomplice jury instruction entitles him to plain error review. The State asserts the defendant has waived the issue, the alleged error was harmless, and the defendant cannot establish plain error as to this issue. Upon our review of the record, we conclude the issue is waived, it was harmless, and plain error review is not warranted.

Initially, we note, the record indicates the defendant waived this issue for failing to request a jury instruction on Mr. Tibbs's status as an accomplice in writing and failing to object to the exclusion of the jury instruction at trial. Tenn. R. App. P. 36(a); Tenn. R.

- 14 -

Crim. P. 30(a); *State v. Page*, 184 S.W.3d 223, 230 (Tenn. 2006) (citing *State v. Cravens*, 764 S.W.2d 754, 757 (Tenn. 1989)); *State v. Robinson*, 146 S.W.3d 469, 489 (Tenn. 2004); *State v. Chad Edward Massengale*, No. E2018-00387-CCA-R3-CD, 2019 WL 1965697, at *11 (Tenn. Crim. App. May 2, 2019). The defendant, however, does not address waiver on appeal and instead asserts he is entitled to plain error analysis of this issue. Our harmless and plain error analyses follow.

A defendant has a right to a correct and complete jury charge. *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000). This right is constitutional in nature. *State v. Phipps*, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994). The trial court must present the propositions of law governing the case plainly to the jury, in such a manner as to enable them to comprehend the principles involved. *State v. Williamson*, 919 S.W.2d 69, 80 (Tenn. Crim. App. 1995). "Nothing short of this will 'satisfy the demands of justice' or the defendant's right to a jury trial." *Id.* (quoting *Crawford v. State*, 44 Tenn. 190, 195 (1867)).

It is well-established that "a conviction may not be based upon the uncorroborated testimony of an accomplice." *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001) (citing *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994)). This Court has defined the term "accomplice" to mean "one who knowingly, voluntarily, and with common intent with the principal unites in the commission of a crime." *State v. Allen*, 976 S.W.2d 661, 666 (Tenn. Crim. App. 1997). This means that the person must do more than have a guilty knowledge, be morally delinquent, or participate in other offenses with the principal actor. *State v. Jackson*, 52 S.W.3d 661, 666 (Tenn. Crim. App. 2001). The test for whether a witness qualifies as an accomplice is "whether the alleged accomplice could be indicted for the same offense charged against the defendant." *Allen*, 976 S.W.2d at 666.

The issue of whether the court or the jury determines a witness's status as an accomplice has been previously determined by this Court:

> The question of who determines whether a witness is an accomplice depends upon the evidence introduced during the course of a trial. When the undisputed evidence clearly establishes the witness is an accomplice as a matter of law, the trial court, not the jury must decide the issue. On the other hand, if the evidence adduced at trial is unclear, conflicts, or is subject to different inferences, the jury, as the trier of fact, is to decide if the witness was an accomplice. If the jury finds the witness was an accomplice, the jury must decide whether the evidence adduced was sufficient to corroborate the witness's testimony.

*State v. Griffis*, 964 S.W.2d 577, 588 (Tenn. Crim. App. 1997) (footnote omitted).

- 15 -

In the present case, the trial court determined the accomplice jury charge was not warranted based upon the facts presented during trial. The record indicates the trial court initially considered the applicability of the accomplice instruction based upon an inference made during Melissa's and, arguably, Ms. Rudd's testimony. Melissa stated, "It just didn't seem right. It felt like [Mr. Tibbs] was setting [O.W.] up." Ms. Rudd testified she found it odd that Mr. Tibbs was at her home prior to the shooting. Before the conclusion of trial, the trial court reasoned the testimony suggested that Mr. Tibbs's may have lured O.W. outside in order to be victimized by the defendant. At the conclusion of the proof, however, the trial court retracted its reliance on this implication, noting:

> Well, for the record, we have discussed the jury charge, made various changes. I decided to take accomplice out. When I was going through that I neglected to notice that the -- the witness[, Antonio Tibbs,] is also listed as a victim, and so I think it can be still argued that it's mighty strange, the facts of the case surrounding -- surrounding him. But I don't think there's enough there to really say that he was an accomplice, just that it's mighty strange how the facts came out, and the family sort of thought he was involved.

In reviewing the record as a whole, we conclude the implications made by Melissa and Ms. Rudd regarding Mr. Tibbs's involvement in the defendant's crimes do not change the undisputed facts that Mr. Tibbs was not in the vehicle as the defendant fired multiple gunshots at his victims, that a bullet grazed Mr. Tibbs during the shooting, that Mr. Tibbs was considered to be a victim of the defendant's crimes, and that Mr. Tibbs was not charged in the crimes. As a result, we agree with the trial court that the record does not contain sufficient evidence to warrant the accomplice jury instruction as it relates to Mr. Tibbs.

Regardless, it is clear the trial court did not present the jury with the accomplice jury instruction. The defendant is correct in that, when a trial court fails to properly instruct the jury concerning accomplice testimony, such an error is subject to plain error analysis. *See Robinson*, 146 S.W.3d at 489. Such an error is harmless, however, when the accomplice's testimony is sufficiently corroborated in the record. *Id.* "[C]orroborating evidence is sufficient if it connects the accused with the crime in question." *Griffis*, 964 S.W.2d at 589. As explained above, sufficient evidence exists in the record to corroborate Mr. Tibbs's testimony as numerous witnesses testified the defendant drove the vehicle from which multiple gunshots were fired at the Oaks where seven people were gathered, killing one victim, injuring two, and putting five others in danger of being shot. Accordingly, any alleged failure of the trial court to instruct the

jury concerning Mr. Tibbs's status as an accomplice or the need for his testimony to be corroborated was harmless. The defendant is not entitled to relief.

Finally, the State asserts the defendant is not entitled to plain error review of this issue, and we agree. Before an error may be recognized, it "must be 'plain' and it must affect a 'substantial right' of the accused." *State v. Adkisson*, 899 S.W.2d 626, 639 (Tenn. Crim. App. 1994). "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." *Page*, 184 S.W.3d at 231. In *State v. Smith*, our Supreme Court adopted *Adkisson*'s five-factor test for determining whether an error should be recognized as plain:

(a) The record must clearly establish what occurred in the trial court;

(b) A clear and unequivocal rule of law must have been breached;

(c) A substantial right of the accused must have been adversely affected;

(d) The accused did not waive the issue for tactical reasons; and

(e) Consideration of the error is "necessary to do substantial justice."

24 S.W.3d 274, 282-83 (Tenn. 2000) (quoting *Adkisson*, 899 S.W.2d at 641-42). "[A]ll five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id.* at 283.

Relying upon our foregoing analysis, plain error review of trial court's decision not to instruct the jury regarding the alleged accomplice status of Mr. Tibbs is not warranted because a clear and unequivocal rule of law has not been breached and the defendant has not been adversely affected by the trial court's decision. *Id.* at 282-83. For these reasons, the issue is waived, the alleged error was harmless, and as a result, the defendant is not entitled to plain error review.

### *Conclusion*

Based upon the foregoing authorities and reasoning, the judgments of the trial court are affirmed.

_____
J. ROSS DYER, JUDGE